Filed 9/19/13  Molina v. Lexmark International CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RON MOLINA, | B227746, B233272, B234675, B237836 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC339177) |
| LEXMARK INTERNATIONAL, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory Alarcon, Judge.  Reversed in part and remanded; affirmed in part.

Jackson Lewis, Frank M. Liberatore, Henry L. Sanchez, Sherry L. Swieca and Sarine C. Sahatjian for Defendant and Appellant.

Law Offices of Sheila Thomas, Sheila Y. Thomas; Lawson Law Offices, Antonio M. Lawson; Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, Thomas R. Freeman, Ekwan E. Rhow, Bonita D. Moore, Karis A. Chi; Law Offices of Richard M. Pearl and Richard M. Pearl for Plaintiff and Respondent.

\* \* \* \* \* \*

In this consolidated appeal, appellant and employer Lexmark International, Inc. (appellant) challenges a class action $7,777,620 amended judgment entered against it after a court trial.[1]  The trial court determined appellant's vacation policy between 1991 and 2009 constituted a "use it or lose it policy" in violation of Labor Code[2] section 227.3. The appeal raises a number of issues including whether:  the class was properly certified; the policy was a lawful "accrual cap"; and damages were properly calculated and/or awarded to all or some of the class members.  Appellant also challenges awards of costs in the amount of $145,341.93 and attorney fees in the amount of $5,722,008.

With respect to the judgment as amended, we conclude the trial court erred in calculating the wages to include commissions rather than base rate of pay.  In all other respects, the judgment as amended is affirmed.  We also affirm the postjudgment awards of costs and attorney fees in their entireties.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Appellant's Vacation Policy*

Appellant is a Delaware corporation with its principal place of business in Lexington, Kentucky.  Appellant has been qualified to do business in California since 1991.  Appellant, which is a "spin-off" of IBM, began operating as a separate entity in March 1991.  From 1991 through 2009, appellant has employed a total of 181 employees in California.  At the time of trial, appellant had 41 California employees.  The class members were or are employed as account and sales managers.

---

[1]  Appellant filed four separate appeals from:  a judgment (case No. B227746); an amended judgment (case No. B233272); a cost memorandum (case No. B234675); and an attorney fee award.  On June 8, 2011, pursuant to the parties stipulation, we consolidated the appeals from the judgment (case No. B227746) and amended judgment (case No. B233272).  On January 5, 2012, we ordered the cost and attorney fees appeals consolidated.  On February 6, 2013, on our own motion we ordered the appeals from the judgment and amended judgment (case No. B227746) consolidated with the cost and attorney fees appeal (case No. B234675) for oral argument and decision.

[2]  All further statutory references are to the Labor Code unless otherwise indicated.

In 1991, appellant's new owners offered a number of IBM employees incentives to work for the new company including signing bonuses and recognition of accrued IBM benefits. Appellant promised to honor vacation and personal choice days. Accrued vacation at IBM could be carried over to employment with appellant. IBM employees had the right to defer vacation time from year to year if they had five years of service or were at least 50 years old. Under the IBM policy, employees had a minimum requirement to take 10 vacation days in the year or within a grace period ending April 30 of the next year.

The parties stipulated that, for each year since 1991, appellant "had only one vacation and personal choice day policy per year applicable to its California employees." The parties also stipulated: "[appellant] has since 1991 applied each of its vacation and personal choice day policies in the same manner to all of its California employees." However, as noted below, the vacation policies varied somewhat between 1991 and 2006.

Appellant changed its vacation policy effective May 31, 1991 through December 31, 1994. Under the new policy, appellant informed managers that the company would "require that employees use all of their earned vacation by year-end." The policy states: "This will be effective for 1991 and all future years. No earned vacation may be deferred and the grace period for unused vacation is discontinued. Also beginning in 1992, each employee with deferred vacation days will be required to use ten previously deferred days annually until all deferred vacation is used." Under the new policy, "[v]acation earned in 1991 which is not used will be lost." A senior manager of employee relations testified in a deposition that the new policy would reduce any succeeding year's vacation time by the number of unused vacation dates. Under the May 31, 1991 policy, employees accrued vacation on an anniversary date.

In January 1995, appellant changed its policy to permit employees to accrue vacation within a calendar year rather than on an anniversary date. There were no other changes to the May 1991 policy. Thus, appellant's vacation policy from 1995 through January 2001 required all employees to take all their vacation in the calendar year it was earned. Employees could not "carry over any unused vacation days into the next year."

3

Effective January 1, 2001 through December 2005, appellant's vacation policy was that an employee "must use all accrued vacation by the end of the year in which it was accrued."

In January 2006, appellant revised its vacation policy regarding California employees. The revised policy provides: "Employees who are based in California are expected to use their entire accrued vacation during the year in which it accrued just as all other employees. However, in the event that business needs prevent an employee from using all of his or her vacation in a given year, any remaining vacation will carry over to the following year subject to the limitation that no employee may have more than 240 accrued hours of vacation and/or personal choice holiday time at any given time. . . ."

Appellant normally sent policy changes to its employees. However, employees were not informed of the 2006 vacation policy change. Cynthia Brooker testified that she was currently employed at Lexmark. She was a supervisor from 1997 through 2004. She discovered the 2006 policy change regarding California employees after she became a manager and again when she went online to look at appellant's employee manual.

Appellant also offered four or five personal choice days, which were meant to be floating holidays. Footnote six of appellant's opening brief concedes "that personal choice days are legally equivalent to vacation days under California law, and, as such, all references to vacation days or vacation pay . . . include personal choice days." The personal choice days were lost if not used in the year they accrued. There was no payout for unused personal choice days at the time of termination.

### The Complaint

Respondent, Ron Molina, filed the class action complaint against appellant on August 31, 2005. The complaint alleged appellant's vacation policy violated section 227.3 by depriving California employees of earned wages. The complaint contained five causes of action for: unpaid wages for accrued vacation pay (§ 200 et seq.); unpaid wages for accrued vacation due upon termination (§§ 201-204, 210, 227.3); penalties for unpaid wages upon termination (§ 203); unfair competition (Bus. & Prof. Code, § 17200 et seq.); and unpaid wages for commissions (solely as to

4

respondent). The complaint requested damages, injunctive relief and attorney fees. Compensation was sought for unpaid vacation wages for the four years preceding the filing of the complaint. The trial court subsequently granted leave to amend the complaint to: allege claims for unpaid personal choice days; extend the period of liability to appellant's inception in 1991; and add a punitive damages claim.

On August 17, 2006, appellant filed a motion to strike portions of the amended complaint, which referred to current and future employees on the ground section 227.3 only applied to former employees. On September 14, 2006, the trial court granted the motion with respect to future employees. But, the trial court denied the motion to strike as to current employees on the ground case law interpreting section 227.3 was not limited to whether an employee must be paid at termination. Rather, the section also concerned whether an employer could force forfeiture of accrued vacation through a use it or lose it policy. On October 2, 2006, respondent filed an amended complaint to eliminate claims on behalf of future employees.

*Class Certification*

Respondent filed a motion for class certification on March 19, 2007. He defined the proposed class as "All California employees of Lexmark International, Inc. employed from January 1, 1991 to the present." The trial court granted the class certification motion on June 20, 2007. The class consisted of 178 of appellant's current and former employees. The trial court found common issues of fact and law predominate and to the extent there was different vacation usage amongst the various class members, the damages could be easily calculated. The trial court also found: the class was ascertainable and consisted of 178 of appellant's current and former employees; the claims were typical of the class representative; and the class representation was adequate.[3] The trial court determined a class action was a superior means rather than individual trials to redress the alleged wrongdoing ( i.e., to prevent advantage to appellant from a policy of requiring employees to lose unused vacation).

---

[3]     Two employees opted out of the class prior to trial.

5

*Liability Evidence*

The trial court bifurcated the liability and damages phases of the case. The following evidence was presented during the liability phase of the trial.

In 1991, appellant stopped tracking its employees' vacation usage.[4] Rather, the managers were responsible for keeping track of vacation accrual and usage of the employees they supervised. The managers chose the method of keeping track of the time. When an employee left the company, appellant's human resources department contacted the manager to determine the number of vacation and personal choice days an employee was owed. Each manager would then consult his or her records and the employee regarding the vacation usage.

The evidence showed that vacation usage by employees varied. Appellant presented evidence which showed that some members of the class had taken some or all of their vacation time. A manager testified appellant's employees had pressure to meet sales quotas and that employees would often miss vacation days trying to meet year-end goals. One employee testified that Lexmark was a growing and brand new company. Employees did not feel comfortable taking vacation because they had to meet their numbers. Management set high quotas to encourage employees to "stretch" to meet goals. The employee testified that she "never made quota until the very last month or two weeks into it or to the very end." Commissions made up approximately 40 percent of employees' annual compensation. Employees "weren't going to reach [their] salary potential unless [they] made [their] numbers first."

In October 2003, class member Manfred John Washington sent an e-mail to Brooker, who was his immediate supervisor. The e-mail stated appellant's vacation policy violated California law. The e-mail contained a link to the California Division of

---

**4** Appellant utilized a software program for tracking hourly employees including time, attendance and vacation usage. Brooker discovered the system at the same time she discovered the 2006 policy change. She tried to use the tracking system to track employee vacation usage. Initially, she was able to use the system but it subsequently changed so that she was no longer able to access it.

6

Labor Standards Enforcement Web site. Brooker forwarded the e-mail to human resources generalist Rebecca Cox on October 27, 2003. In her e-mail, Brooker stated: "Hi Becky, How do I address this issue with my California employees? Lexmark policy states that we do not carry over vacation and California State Law says it is illegal not to let an employee carry over their vacation." The e-mail was forwarded to Cox's supervisor, Susan Gentry. Gentry promised to follow-up on the information in a telephone call with Washington and Brooker and in an e-mail with Washington.

Washington subsequently sent another e-mail to Gentry and Cox which provided the same link provided in the original e-mail to Brooker. Gentry shared the information with corporate counsel, Robert Patton. Patton referred Gentry to vice-president of human resources, Jeri Stromquist Isbell. Isbell eventually instructed Gentry to draft an e-mail to California managers, which emphasized that employees were to use all their vacation by the end of the year.

On October 14, 2005, appellant's general counsel sent an e-mail to its California managers. The e-mail stated that appellant was reviewing its vacation and personal time policy in California. The California employees were to fill out a "survey" indicating whether he or she had taken "all" vacation and personal time given by appellant. The employees were instructed to identify all vacation and personal time not taken while working for appellant. Employees were required to "certify" the information was accurate and correct. By taking the "survey," employees agreed that they were subject to disciplinary action for false or inaccurate information. Two employees testified that the threat of disciplinary action including termination affected the results of the survey. This was because the survey covered an entire course of employment and they did not have documentation to support whether the time was taken or not taken. One manager testified that he understood that unused vacation from prior years had been forfeited. Therefore, he answered he had taken all the vacation even though the response was inaccurate.

On September 30, 2005, the California Labor Commissioner determined that appellant had a "use it or lose it" policy that violated section 227.3. Appellant was

7

ordered to pay class member John Martin damages for lost vacation and personal choice day wages from January 2001 through March 2005.

In May 2006, Washington filed a complaint with the California Labor Commissioner against appellant seeking vacation and personal choice day wages due at the time of termination from the company. On January 23, 2007, the Commissioner awarded Washington a "pro rata" share of earned vacation wages for the time period between January 1, 2006 and May 23, 2006.

*The Liability Determination*

The trial court determined that vacation pay is a form of deferred compensation, which vests as labor is rendered. Section 227.3 protects vested wages from forfeiture under "use it or lose it" policies. The trial court determined Lexmark's vacation policy violated the provisions of section 227.3 prohibiting forfeiture of vacation and personal choice days and requiring payment upon termination of all vacation and personal choice day wages.

The trial court further concluded the law and the facts did not support any of appellant's affirmative defenses. The statute of limitations was tolled because Lexmark had a vacation policy that required forfeiture of vacation and personal choice days. And, the law and the facts did not support the affirmative defense that class members John Martin and Manny Washington must be excluded from the class.

The class was not limited to former employees employed from August 31, 2001, who did not sign releases upon termination. Section 206.5 "prohibits an employer from requiring an execution of any release of a claim or right on account of wages due or to become due, unless payment of those wages have been paid." Appellant failed to produce any evidence that terminated employees were paid all accrued, unused vacation wages which were owed. The court found that "Lexmark cannot rely upon releases that violate the requirements of . . . [sections] 206 and 206.5."

The trial court found that appellant's policy constituted a violation of California Business and Professions Code section 17200. Appellant was ordered to develop and implement vacation and personal choice policies for California employees that they may

8

carry over vacation and may accrue up to 240 hours of vacation and personal choice days without a business needs requirement. The trial court also ordered appellant to: (1) notify its California employees in writing of their rights under sections 200 et seq. and 227.3; and (2) maintain a tracking system to notify the California employees of usage and unused vacation and personal choice days.

*Damages Evidence*

In the damages phase of the trial, the parties presented conflicting lay evidence concerning the amount of vacation time the employees had used or lost during the course of employment with appellant. The parties' experts disagreed on the methodology for calculating the damage to the class.

Respondent's expert, Amy Aukstikalnis, Ph.D., had expertise in class actions involving economics and employment litigation. Her expertise included calculation of damages in class actions, wage and hour, meal and rest breaks and a vacation forfeiture case. Aukstikalnis used information from appellant's vacation pay policy on how the vacation time and personal choice days accrued annually. She then relied on birth and start date data from information provided by appellant to calculate accruals on an annual basis. She multiplied that rate by regular pay rate based on gross earnings during the last year of employment with appellant. This amount was calculated after she subtracted any amount for vacation paid at termination, separation or severance payment. She then subtracted out any vacation days where appellant's records showed that a class member had received vacation payouts upon termination.

Aukstikalnis calculated wait time penalties by multiplying 30 days of wage at the final rate for all class member terminated as of October 2007. She calculated interest on the accrued vacation through October 31, 2009.

Aukstikalnis opined that the value of lost vacation and personal choice day wages was $10,539,043. The calculation was for the time period between 1991 and year-end 2007. The interest accrued through June 30, 2008 was $3,981,537 at 10 percent per annum. The total damage estimate was $16,721,608 valuing the forfeited vacation time and waiting time penalties. The $16,721,608 figure represented a forfeiture rate of

9

100 percent.  She also calculated forfeiture rates of 80 percent and 65 percent.  She subtracted what was paid out at the time of termination from each rate.

Appellant's expert, Stefan Boedeker, specialized in statistics and economics.  His methodology involved a review of company policy and other company records to establish vacation the individuals were entitled to receive.  He considered the measure of damages by making an assessment of vacation usage.  Boedeker reviewed a list of current and former employees, biographical information about them, termination information showing vacation payouts, pay stubs, employee surveys and deposition testimony.  He used a statistical approach because appellant had no vacation usage records.  He extrapolated from available data to estimate vacation usage for individuals for whom he had no data.  Boedeker opined that the value of the vacation and personal time not taken from current and former employees was $594,398.  His opinion assumed the vacation days did not expire and were not subject to an accrual cap.  The total was $405,000 if current employees were subtracted.

The parties pointed out what they perceived to be the weaknesses or flaws in their opponent's expert's methodology.  For example, respondent focused on the fact appellant's expert did not consider vacation and personal choice time which had been lost due to the vacation policy.

By contrast, appellant criticized respondent's expert for not using a statistical model and for using accrued vacation from employment with IBM.  Appellant also found fault with Aukstikalnis's testimony that she did not consider any evidence of vacation usage other than records showing vacation time was paid out at the time of separation.  The $16,721,608 figure was based on an assumed 100 percent forfeiture of vacation by all class members.  The rate was premised upon the fact that there were no contemporaneous company records which she considered to be the most reliable source of information.

### The Statement of Decision and Judgment

On June 18, 2010, the trial court issued its statement of decision on class action damages.  The trial court found appellant "failed to maintain accurate and adequate

10

records of the employees' vacation usage and forfeitures." The trial court noted that California had adopted United States Supreme Court authority in *Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680 (*Anderson*) regarding the burden of proving damages in wage and hour cases where the employer failed to maintain records.

The trial court found respondent satisfied the initial burden of proving work had been performed and employees were not properly compensated under an illegal use it or lose it policy. The burden then shifted to appellant to refute respondent's evidence with evidence of the precise amount of work performed or sufficient evidence to negate inferences. The burden shifted because fundamental fairness standards required that injured parties be compensated for damage proximately caused by a wrongdoer and the essential facts necessary to prove the damages were exclusively in appellant's knowledge and control. In the absence of the evidence, the trial court was authorized to award damages even if the calculation is only an approximation.

The trial court noted that there were flaws in the analyses of both experts. With respect to appellant's expert the trial court concluded that the methods withstood an admissibility challenge by respondent. But, the trial court gave very little weight to his analysis because of "the extremely limited data set" available given appellant's failure to keep proper business records.

The trial court found similar flaws in respondent's expert analysis. Although her analysis contained a reliable total possible day estimate less payouts at termination, it failed to account for class member evidence indicating usage rates greater than zero percent. So, while dismissing the 100 percent forfeiture rate, the trial court determined "Dr. Aukstikalnis's calculations serve as a reliable base from which the court may calculate a more reasonable damage measure."

The statement of decision states: "Because of the aforementioned deficiencies, it is within the court's discretion to determine a reasonable approximation of damages . . . . Taking into account the flaws and limitations inherent in both [respondent's] and [appellant's] calculations, which ranged from 10.3 [percent] to 80 [percent], this court finds that a reasonable approximation of the forfeiture rate is 45.2 [percent]." Under this

11

rate, the trial court awarded damages in the total amount of $8,299,242, including estimated forfeiture, interest, wait-time penalties and offsets. The trial court rejected appellant's claims that all applicable class members should be deposed to determine damages on the ground such a process would defeat the purpose of class action litigation. That is a class action is "a reasonably expeditious means of calculation and distribution of class-wide aggregate damages if individual adjudication of entitlements of all class members or a substantial portion of the class members would impose impossible burdens on courts and the litigants."

The trial court entered a judgment in favor of the class on September 20, 2010 in the amount of $8,299,242 plus interest. Respondents were awarded attorney fees upon motion and costs upon a timely filed memorandum of costs. The trial court awarded injunctive relief pursuant to Business and Professions Code section 17200 et seq. With regard to its California employees, appellant was ordered, among other things, to develop and implement vacation and personal choice policies providing that they may carry over at least 240 hours of earned vacation and personal choice holidays without a business needs requirement. The trial court retained jurisdiction to interpret, implement, and enforce the judgment. Appellant filed a notice of appeal of the judgment on September 30, 2010 (case No. B227746).

### *The New Trial Motion and Amended Judgment*

On October 18, 2010, appellant moved for a new trial, on among other grounds, that the damages award was excessive. Appellant asserted the award improperly included damages for current employees, who had not been terminated within the meaning of section 227.3 The award should have excluded $1,865,276 in damages for IBM legacy days. The award was excessive in that it was calculated at gross rate of pay. Appellant's vacation policy since 1991 has clearly been that vacation pay is not a "gross rate of pay" but at base rate of pay.

Appellant also asserted the trial court erred in its findings regarding Boedeker's expert opinion and the percentages of damages. Appellant argued the statement of

12

decision failed to address many of appellant's claims including IBM legacy employees and the alleged deficiencies in relying on Aukstikalnis's expert opinion.

Appellant contended the statement of decision was inconsistent because it conflicted with prior rulings that: current employees were not entitled to damages; and wait time penalties accrue only after October 2003. The statement of decision did not address the manner and or method of distribution of damages. The trial court cannot set appellant's accrual cap. The burden was improperly shifted to appellant because it had no statutory obligation to maintain vacation records and class members had superior knowledge of vacation usage. Respondent did not meet the burden of establishing class damages. The trial court improperly denied appellant the right to depose all 176 class members in order to show actual damages.

On November 17, 2010, the trial court granted the new trial motion in part by subtracting the payment of damages to current employees from $8,299,242. The trial court reopened the proceedings for introduction of additional evidence on damages. The trial court rejected appellant's other claims on the ground they lacked merit.

On January 21, 2011, the trial court reopened trial on the damages issue and ordered further briefing. The parties filed additional briefs with evidence. On March 7, 2011, the trial court issued a ruling on damages calculations in response to appellant's new trial motion. The trial court found that respondent's calculation of damages of $7,774,620 was correct. On April 21, 2011, the trial court amended the September 20, 2010 judgment "as to the amount of the damage award only." The trial court ruled: "The original judgment, as amended, stands." On May 24, 2011, appellant filed a notice of appeal of the amended judgment (case No. B233272).

***The Costs and Attorney Fee Awards***

On March 17, 2011, respondent filed a memorandum of costs seeking $156,899.76 in costs. After appellant filed a motion to strike costs, the trial court awarded respondent $145,341.93 in costs on May 25, 2011. Appellant appealed the cost award on July 21, 2011 (case No. B234675).

13

On June 20, 2011, respondent filed a motion for an attorney fee award and additional costs. Appellant opposed the motion. The hearing on the attorney fees motion was originally set for July 29, 2011. Prior to the hearing date, appellant moved ex parte for production of time records in electronic form or alternatively for an extension of time to oppose the motion. The parties subsequently agreed to a continued hearing. On July 13, 2011, appellant filed a notice of ruling which stated that, upon stipulation of the parties, the hearing date was continued to September 13, 2011. However, apparently due to some misunderstanding between the parties, the original hearing date remained on the court's calendar.

On September 29, 2011, after briefing, motions, and stipulations, the trial court issued an order on respondent's application to set a new hearing date for award of reasonable attorney fees. The September 29, 2011 order provided among other things that the judgment was effectively entered on April 21, 2011. Respondent's new trial motion, which was originally filed on June 14, 2011 [*sic*], was set to be heard on July 29, 2011. The trial court concluded that, if respondent filed a Code of Civil Procedure section 473 motion, the trial court would grant him relief for excusable neglect based on the misunderstanding as well as appellant's notice of ruling.

On October 6, 2011, respondent filed a motion for relief from default pursuant to Code of Civil Procedure section 473. On October 28, 2011, the trial court entered an order granting respondent relief pursuant to Code of Civil Procedure section 473. On October 28, 2011, the trial court granted respondent's motion for attorney fees and costs in the amount of $5,722,008.07. Appellant appealed the attorney fee award on December 9, 2011 (case No. B237836).

## DISCUSSION

### I. Class Certification

In a supplemental opening brief, appellant argues the trial court abused its discretion in certifying or refusing to decertify the class for alleged violations of section 227.3. To support this contention, appellant relies primarily on *Duran v.*

14

*U.S. Bank National Assn.* (2012) 203 Cal.App.4th 212, review granted and opinion superseded by *Duran v. U.S. Bank National Assn.* (2012) 275 P.3d 1266.

Code of Civil Procedure section 382 provides that a class action may be brought "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." A class action is authorized when a plaintiff meets his or her burden of establishing the existence of an ascertainable class and a well-defined community of interest. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1103–1104; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913.) "The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470; accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326.)

The focus in a class certification dispute is not on the merits but on the procedural issue of what types of questions are likely to arise in the litigation—common or individual. (*Sav-On Drug Stores, Inc. v. Superior Court*, *supra*, 34 Cal.4th at pp. 326–327; *Lockheed Martin Corp. v. Superior Court*, *supra*, 29 Cal.4th at pp. 1106–1107; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439–440.) Thus, the existence of some common issues of law and fact does not dispose of the class certification issue. (*Lockheed Martin Corp. v. Superior Court*, *supra*, at pp. 1108–1109; *Washington Mutual Bank v. Superior Court*, *supra*, 24 Cal.4th at p. 913.) Rather, in order to justify class certification, a class plaintiff is required to establish the "questions of law or fact common to the class *predominate* over the questions affecting the individual members." (*Washington Mutual Bank v. Superior Court, supra*, at p. 913, italics added; accord, *Lockheed Martin Corp. v. Superior Court*, *supra*, at p. 1108.) "[I]f a class action 'will splinter into individual trials,' common questions do not predominate and litigation of the action in the class format is inappropriate." (*Hamwi v. Citinational-Buckeye Inv. Co.* (1977) 72 Cal.App.3d 462, 471; accord, *McCullah v. Southern Cal. Gas Co.* (2000) 82

15

Cal.App.4th 495, 501–502.) Thus, a class action is inappropriate if each class member is required to "litigate substantial and numerous factually unique questions to determine his or her individual right to recover." (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 397; accord, *Wilens v. TD Waterhouse Group, Inc.* (2003) 120 Cal.App.4th 746, 756; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 742.) But, a class action may be maintained even if each class member must individually show eligibility for recovery or the amount of damages. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022; *Sav-On Drug Stores, Inc. v. Superior Court*, *supra*, at pp. 332–333.)

Review of a class certification "is narrowly circumscribed." (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1022.) In *Brinker*, our Supreme Court explained: "'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' [Citation.]" (*Ibid.*)

### A. Substantial evidence supports the predominance finding.

Appellant claims the predominance finding was deficient. We find no basis for setting it aside because the finding was supported by substantial evidence. The parties stipulated that appellant had one vacation policy since 1991 which had been uniformly applied to all its employees. Appellant's written vacation policy required employees to "use or lose" vacation and personal choice days. The class action alleged that this policy violated California law. Evidence presented in support of the certification motion

16

showed that respondent and other putative class members had forfeited vacation and personal choice under the alleged illegal policy. Thus, the trial court did not abuse its discretion in finding common issues predominate as to whether an illegal employment policy was imposed against the putative class members. (See *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at pp. 1032–1033; *Prince v. CLS Transportation, Inc.* (2004) 118 Cal.App.4th 1320, 1328.)

For that reason, there is no merit to appellant's claim the certification motion should have been denied because the amount of damages varied with individual class members based on how many vacation days they may have forfeited. The fact "that each member of the class must prove his [or her] separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809.) As previously noted, the class action could be maintained even if individual claims of recovery and the amount of damages differed among the class members. (See *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1022; *Sav-On Drug Stores, Inc. v. Superior Court*, *supra*, 34 Cal.4th at pp. 332–333.)

### B.     *The class was ascertainable.*

Appellant also contends the class was not ascertainable. "The ascertainability requirement is a due process safeguard, ensuring that notice can be provided 'to putative class members as to whom the judgment in the action will be res judicata.' [Citation.] 'Class members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records. [Citation.]' [Citation.] In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and the means of identifying class members. [Citation.]" (*Sotelo v. MediaNews Group, Inc.* (2012) 207 Cal.App.4th 639, 647–648; see also *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 914.)

In this case, the class was defined as "All California employees of Lexmark International, Inc. employed from January 1, 1991 to the present." The parties agreed that there were 178 former and current employees of Lexmark that comprised the class as

17

defined.  The class members were identified by Lexmark's corporate records.  (*Sotelo v. MediaNews Group, Inc.*, *supra*, 207 Cal.App.4th at p. 648; *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 932.)  There was nothing amiss in the trial court's determination that the class was ascertainable.

     *C.*     ***The existence of affirmative defenses did not preclude class certification.***

Appellant asserts, in certifying the class, the trial court improperly rejected its affirmative defenses that certain class members were potentially barred by:  a four-year statute of limitations (Code Civ. Proc., §§ 312, 337); collateral estoppel or res judicata principles; voluntary releases; and status as current employees.  Normally, "[t]he certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'"  (*Lockheed Martin Corp. v. Superior Court, supra,* 29 Cal.4th at p. 1104 quoting *Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at pp. 439–440.)  The assertion of an affirmative defense such as a limitations defense does not categorically preclude class certification.  (*Lockheed*, *supra*, at pp. 1104–1106 & fn. 4.)  Rather, "'[t]he ultimate question in every case of this type is whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations]"  (*Id*. at pp. 1104–1105.)  We cannot conclude that, at the time of class certification motion, the existence of potential affirmative defenses regarding limitation of actions, releases, collateral estoppel or res judicata principles precluded class treatment of the alleged unlawful vacation policy.

## II.    Liability for Appellant's Vacation Policies

Appellant claims the trial court misinterpreted section 227.3 and erroneously concluded that the vacation policies provided for forfeiture rather than "accrual caps."  To the extent resolution of the issue involves interpretation of the statute, the question is legal requiring de novo review.  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801; *Samples v. Brown* (2007) 146 Cal.App.4th 787, 799; *In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1157.)  But, the trial court's resolution of the dispute as to whether appellant's stated policy was an accrual cap rather than a use it or lose policy is

18

more in the nature of a factual issue (*Boothby v. Atlas Mechanical, Inc.* (1992) 6 Cal.App.4th 1595, 1603), which we review for substantial evidence. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660; *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461–462.)

### A. Appellant's vacation policy violated section 227.3.

Section 227.3 provides: "Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination. The Labor Commissioner or a designated representative, in the resolution of any dispute with regard to vested vacation time, shall apply the principles of equity and fairness."

"It is established that vacation pay is not a gratuity or a gift, but it is, in effect, additional wages for services performed." (*Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 779 (*Suastez*).) And, once vacation pay has vested, section 227.3 precludes its forfeiture. (*Suastez*, *supra*, at p. 784; *Henry v. Amrol, Inc.* (1990) 222 Cal.App.3d Supp. 1, 5.) Thus, a policy that forces employees to either use or forfeit already accrued vacation time violates section 227.3. (*Suastez*, *supra*, at p. 784; *Boothby v. Atlas Mechanical, Inc., supra,* 6 Cal.App.4th at p. 1601.)

The evidence in this case established that, beginning in 1991, appellant adopted a policy that required class members to take vacation and personal choice days. A number of employees lost vacation and personal choice days as a result of the policy. Under the policy, employees were only paid for vacation time accrued during the years they were terminated without regard to prior vested vacation which had been forfeited. We agree with the trial court's determination that appellant had an illegal policy that forced its employees to either use or forfeit already accrued vacation time in violation of section 227.3. (*Boothby v. Atlas Mechanical, Inc., supra,* 6 Cal.App.4th at p. 1601.)

19

**B.    *There was substantial evidence that appellant had a forfeiture policy.***

Appellant claims it could not have violated section 227.3 because its vacation policy was an "accrual cap" rather than a forfeiture policy. *Boothby v. Atlas Mechanical, Inc.*, *supra*, 6 Cal.App.4th at page 1601 explained the distinction between the two concepts as follows: "A 'use it or lose it' vacation policy provides for forfeiture of vested vacation pay if not used within a designated time, while a 'no additional accrual' vacation policy prevents an employee from earning vacation over a certain limit. Although both policies achieve virtually the same result, the former is impermissible and the latter permissible."

*Boothby* further explained: "This distinction is consistent with *Suastez*. Because vacation in an amount established by the employment agreement is deferred compensation for services rendered, the right to paid vacation vests as the employee labors. It is nonforfeitable. However, if the employment agreement precludes an employee from accruing more vacation time after accumulating a specified amount of unused vacation time (a 'no additional accrual' policy), the employee does not forfeit vested vacation pay. A 'no additional accrual' policy simply provides for paid vacation as part of the compensation package until a maximum amount of vacation is accrued. The policy, however, does not provide for paid vacation as part of the compensation package while accrued, unused vacation remains at the maximum. Since no more vacation is earned, no more vests. A 'no additional accrual' policy, therefore, does not attempt an illegal forfeiture of vested vacation. [¶] As stated in *Henry v. Amrol, Inc.* (1990) 222 Cal.App.3d Supp. 1, the law does not prevent an employer from 'announcing a level beyond which additional vacation time would no longer accrue. This would prevent additional vacation from vesting after a certain level had been reached. However, once vacation time has vested, it cannot be divested. There is an obvious difference between a policy which prevents additional vacation time from accruing after a certain amount of such time accrues and a policy which would divest an employee of already accrued vacation time.' [Citations.]" (*Boothby v. Atlas Mechanical, Inc.*, *supra*, 6 Cal.App.4th at pp. 1601–1602.)

20

Appellant's primary claim is that since 2006 it has an accrual cap policy. In 2006 appellant revised its vacation policy regarding California employees. The revised policy provided California employees were expected to use entire accrued vacation during the accrual year. However, to the extent there were business needs, "any remaining vacation will carry over to the following year subject to the limitation that no employee may have more than 240 accrued hours of vacation and/or person choice holiday time at any given time. . . ."

We begin by noting that there was no evidence appellant notified its California employees including the supervisors of this 2006 policy change. Indeed, many employees still understood that vacation and personal choice days which were not taken were lost. One of appellant's current employees, who was also a supervisor, testified that she only discovered the new policy by chance online. The failure to notify its employees of the purported business exception created in 2006 accrual cap was sufficient to raise the inference that there was no real change in what the trial court determined was a forfeiture policy.

Furthermore, the record does not show appellant ever announced a level beyond which additional vacation time would no longer accrue prior to 2006. Indeed, appellant does not dispute that its 2001-2005 policy specifically stated it was use it or lose it. From May 1991 through 2000, the vacation policy stated accumulated but unused vacation time could be carried over into the next year. The employee's allotment was reduced by the number of vacation days that carried over. However, the record shows the policy ultimately divested employees of already accrued vacation time. Employees were told that they either take vacation or they lost it. They could not carry over vested time. At the beginning of the year, the employees started fresh. Employees testified that they lost vacation hours when they did not take all of their vacation. This was sufficient evidence to show a forfeiture policy rather than an accrual cap.

21

## III. Damages

Appellant claims the damages award must be set aside because: the class failed to submit evidence of classwide damages; and, the trial court erroneously shifted the burden of proof to appellant to disprove damages.

In *Anderson*, *supra*, 328 U.S. 680, the United States Supreme Court considered the measure of damages where an employer failed to compensate employees for overtime under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) and failed to keep adequate records. (*Anderson*, *supra,* at p. 684.) *Anderson* rejected the Circuit Court of Appeals' conclusion the employees had the burden of proving they did not receive wages and overtime payments. (*Id*. at p. 687.) Rather, the employees had the burden of proving: (1) the work was performed; and (2) there was inadequate compensation. (*Ibid*.) But, the remedial nature of the Fair Labor Standards Act as well as the great public policy in its enactment "militate[d] against making that burden an impossible hurdle for the employee." (*Ibid.*)

*Anderson* noted that the Fair Labor Standards Act required the employer to keep proper records of wages, hours, and other employment conditions and practices. As such, the employer "is in position to know and to produce the most probative facts concerning the nature and amount of work performed." (*Anderson, supra,* 328 U.S. at p. 687.)

*Anderson* further explained: "Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy. It is in this setting that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof. [¶] When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without

22

paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. [Citation.]" (*Anderson, supra,* 328 U.S. at pp. 687–688.)

*Anderson's* holding has been adopted by California courts to shift the burden of proof to employers when their failure to keep adequate records would prevent employees from proving labor disputes. (See *Bell v. Farmers Ins. Exchange, supra,* 115 Cal.App.4th 715 [unpaid overtime compensation]; *Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721, 726–728 [overtime hours]; see also *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1188–1189 [to prove the class members]; *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961–963 [meal and rest time breaks].)

Contrary to appellant's assertions otherwise, the burden shifts even in the absence of a statutory recordkeeping duty. (*Amaral v. Cintas Corp. No. 2, supra,* 163 Cal.App.4th at p. 1188; *Hernandez v. Mendoza*, *supra*, 199 Cal.App.3d at p. 726.) "[T]he underlying rationale for burden shifting is not the employer's duty of recordkeeping but the 'fundamental principle of American jurisprudence that for every wrong there is a remedy, and that, unless countered by public policy, an injured party should be compensated for all damage proximately caused by the wrongdoer. [Citations.]' [Citation.]" (*Amaral v. Cintas Corp. No. 2, supra,* at p. 1190; *Hernandez v. Mendoza*, *supra*, at p. 726.)

Here, the class presented evidence of forfeited unused vacation pay. Appellant had not kept vacation records since 1991. Under these standards, the trial court properly shifted the burden of proof.

23

## IV.    Due Process

Appellant is also not entitled to prevail on its claims its due process rights were violated by the trial court's use of a statistical methodology to calculate an aggregate damage.

*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th 715 explained:  "the question whether a procedural device used in judicial proceedings to deprive a defendant of property comports with due process is determined by a balancing of interests:  '[F]irst, consideration of the private interest that will be affected by the [procedure]; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, . . . principal attention to the interest of the party seeking the [procedure], with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections.'  [Citations.]"  (*Id*. at pp. 751–752 quoting *Connecticut v. Doehr* (1991) 501 U.S. 1, 11.)

Appellant's interest, which was affected by the method of proof, was the total liability to the class members for forfeited vacation and personal choice days.  But, appellant's due process objection to a statistical sampling determination must be limited to the argument "the procedure affected its overall liability for damages."  (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at p. 752.)  This is because appellant's liability is not affected by determining the individual entitlements of class members.  The presence of members in the class, who may not be entitled to damages, while pertinent to the trial court's discretion in certifying the class, is not pertinent to due process principles unless inclusion of those class members increased the total amount of damages.  (*Ibid.*)

Second, the risk of an erroneous deprivation did not preclude the statistical methodology.  *Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th 715, rejected the argument that the determination of aggregate damages on the basis of statistical inferences improperly allows particular employees to recover damages who are otherwise not entitled to them.  *Bell* noted the same possibility existed in federal wage cases as well as most class actions.  (*Id*. at p. 750.)  As a result, individualized proof of damages is not

24

required because it "would challenge all class action judgments adopting reasonably expeditious means of distributing the recovery among class members." (*Ibid*.) *Bell* further explained that the use of statistical sampling to calculate damages yielded an average figure which would overcompensate some and under compensate other individual employees. (*Id.* at pp. 750–751.) But, the disadvantage to the individual employees offered a means of vindicating underlying labor policies without clogging courts or deterring small claimants who could not afford the cost of litigation. (*Ibid*.)

Indeed, an employer who is liable for unpaid wages "cannot be heard to complain that the damages lack the exactness and precision of measurement," which would have been possible with adequate record keeping. (*Anderson, supra,* 328 U.S. at p. 688.) Even if the lack of adequate record keeping is mistaken, an employer, who has received the benefit of the employees' work, "cannot object to the payment for the work on the most accurate basis possible under the circumstances." (*Ibid*.) In addition, rules prohibiting recovery of uncertain and speculative damages are inapplicable in such case because those rules only apply "where the fact of damage is itself uncertain." (*Ibid*.) Rather, the damage is made certain by proof: (1) the employee performed work; and (2) the employer did not pay as required by law. (*Ibid*.) "The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.' [Citation.] It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages. [Citations.]" (*Ibid.*) Under a just and reasonable inference analysis, the question is whether the testimonial evidence is "'fairly representational.'" (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at p. 748.)

Here, the evidence established that appellant began enforcing a use it or lose it vacation policy with its employees beginning as early as 1991. A number of employees forfeited all or some of the vacation and personal choice days. Appellant kept no records of accrued vacation time. Appellant had a policy of not paying its employees for vested unused vacation days when they terminated their employment. The trial court calculated

damages at a forfeiture rate of 45.2 percent.  The evidence varies as to whether some employees forfeited all, some, or none of their vacation and personal choice days as a result of the forfeiture policy dating back to 1991.  Thus, an inference may be that the employer is actually advantaged as to those class members, who forfeited as much as 100 percent of their vacation and personal choices days.

Under the circumstances, the trial court had discretion "to weigh the disadvantage of statistical inference—the calculation of average damages imperfectly tailored to the facts of particular employees—with the opportunity it afforded to vindicate an important statutory policy without unduly burdening the courts."  (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at p. 751.)

Third, the trial court's utilization of the statistical sampling method comported with due process principles.  "In this area of litigation, the California Supreme Court has in fact 'challenged the trial courts to develop "pragmatic procedural devices" to "simplify the potentially complex litigation while at the same time protecting the rights of all the parties."  [Citations.]'"  (*Bell v. Farmers Ins. Exchange*, *supra,* 115 Cal.App.4th at p. 747 quoting *State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 471.)  Due process principles do not prevent a trial court from calculating damages on a classwide basis as opposed to requiring individual testimony by all class members.  (*Bell v. Farmers Ins. Exchange*, *supra*, at p. 747; *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 129, fn. 4.)  This is because "'such an aggregate calculation will be far more accurate than summing all individual claims.'"  (*Bell v. Farmers Ins. Exchange*, *supra*, at p. 747, fn. 19.)

The use of pattern and practice evidence by representative testimony of a small percentage of employees is a common practice in wage disputes for back pay in federal and state courts.  (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at pp. 748–750 [citing federal cases granting back wages to nontestifying employees on the basis of pattern and practice evidence].)  "[T]he use of statistical sampling in an overtime class action 'does not dispense with the proof of damages but rather offers a different method

26

of proof.' [Citation.]" (*Sav-On Drug Stores, Inc. v. Superior Court, supra,* 34 Cal.4th at p. 333.)

We also disagree with appellant's claim in the supplemental opening brief that the trial court management orders were unduly restrictive as to appellant's discovery rights and ability to present affirmative defenses as to each class member. Appellate "'review of a trial court's plan for proceeding in a complex case is a deferential one that recognizes the fact that the trial judge is in a much better position than an appellate court to formulate an appropriate methodology for a trial.'" (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at p. 751; *In re Chevron U.S.A.* (5th Cir. 1997) 109 F.3d 1016, 1018.) As *Bell v. Farmers Ins. Exchange* explained: "[S]tatistical inference offers a means of vindicating the policy underlying the Industrial Welfare Commission's wage orders without clogging the courts or deterring small claimants with the cost of litigation. In a particular case, the alternative to the award of classwide aggregate damages may be the sort of random and fragmentary enforcement of the overtime laws that will fail to effectively assure compliance on a classwide basis. In [*Anderson*]*,* the court held that 'the remedial nature of this statute and the great public policy which it embodies' justified a reduced standard of proof of damages. [Citation.] The same consideration militates in favor of a reasonably expeditious means of calculating and distributing classwide aggregate damages if individual adjudication of the entitlements of all class members, or a substantial portion of the members, would impose impossible burdens on the courts and litigants." (*Bell v. Farmers Ins. Exchange*, *supra*, at p. 751, fn. omitted.) Respondent is correct that due process principles did not preclude the trial court from utilizing the statistical methodology to determine damages. Appellant cannot prevail on its due process claims.

## V.     The Affirmative Defenses

Appellant also challenges the trial court's resolution of a number of its affirmative defenses.

### A.     *The releases did not make the class over-inclusive.*

Appellant asserts that the trial court failed to exclude from the class employees who signed releases upon termination. Contract principles apply in interpreting releases; and contract interpretation is normally a legal question requiring independent review. (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356.) The goal in interpreting a release is "to ascertain the parties' actual intent at the time they made the contract." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 528 citing Civ. Code, § 1636.) "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.)

Section 223.7 requires an employer to pay for all vested vacation to terminated employees as wages and prohibits the employer from having a policy providing for forfeiture of vested vacation time. Section 201, subdivision (a) provides that upon discharge "the wages earned and unpaid at the time of discharge are due and payable immediately." Section 219, subdivision (a) provides that section 223.7 cannot "in any way be contravened or set aside by private agreement, whether written, oral or implied." Moreover, section 219 prohibits employers and employees from "even voluntarily" agreeing to circumvent section 227.3. (*Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 619.) Similarly, the general prohibition against waiver of public benefits statutes prohibits circumvention of section 227.3's protections. (*Henry v. Amrol, Inc.*, *supra*, 222 Cal.App.3d Supp. at pp. 6–7.)

In addition, wage dispute releases are governed by sections 206 and 206.5. Section 206, subdivision (a) states: "In case of a dispute over wages, the employer shall pay, without condition and within the time set by this article, all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed." Section 206.5, subdivision (a) provides: "An

employer shall not require the execution of a release of a claim or right on account of wages due, or to become due, or made as an advance on wages to be earned, unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee. Violation of this section by the employer is a misdemeanor." Nevertheless, a release may be effective in the case of a bona fide wage dispute and the employee accepts benefits in exchange for a release of all claims. (See, e.g., *Aleman v. AirTouch Cellular* (2012) 209 Cal.App.4th 556, 577–578; *Watkins v. Wachovia Corp.* (2009) 172 Cal.App.4th 1576, 1586–1587; *Chindarah v. Pick Up Stix, Inc.* (2009) 171 Cal.App.4th 796, 802–804.)

At issue here is whether 25 releases signed by terminated employees were meant to cover forfeited vested vacation time. The question is whether the evidence showed as a matter of law bona fide disputes with the 25 employees over the vacation wages and acceptance of benefits in exchange for the release of all claims. But, there was no evidence that any of releases concerned an actual dispute over lost or forfeited vacation time. It is not apparent from any of the releases that the parties intended to compensate the terminated employees for illegally lost or forfeited vacation pay. Thus, there is no basis for concluding any of the releases were intended to compensate the terminated employees for any lost or forfeited vacation pay. The trial court did not err in refusing to exclude the 25 members who had signed releases.

### B.     *Appellant was not entitled to rely on the statute of limitations as a defense.*

Appellant argues the class was overly inclusive because it included claims barred by the four-year statute of limitations in Code of Civil Procedure section 337. The statute of limitations for bringing a claim under section 227.3 is four years if the vacation pay claim is based on a written contract or policy or two years if the claim is an oral contract or policy. (Code Civ. Proc., §§ 337, subd. 1, 339, subd. 1; *Church v. Jamison* (2006) 143 Cal.App.4th 1568, 1577.) Citing *Sequeira v. Rincon-Vitova Insectaries, Inc.* (1995) 32 Cal.App.4th 632 (*Sequeira*), the trial court concluded that "the statute of limitations is

29

tolled where [appellant] had a vacation policy that required employees to forfeit vacation and personal choice days for years."

We agree with respondent that the result in this case is controlled by the reasoning of *Reynolds v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 726 (*Reynolds*). In *Reynolds*, after an employee suffered a heart attack at work, his employer failed to give the employee requisite workers' compensation benefits notices. (*Id*. at pp. 727–728.) The Workers' Compensation Appeals Board concluded the employee's workers' compensation claim filed almost three years later was untimely. *Reynolds* rejected the contention the employee's claim was time-barred because the employer failed to notify the injured employee of his rights under the law. (*Id*. at pp. 728–730.) *Reynolds* noted that the employer had statutory obligations to notify an injured employee of rights under the workers' compensation law. (*Id*. at pp. 729–730.) "The clear purpose of these rules is to protect and preserve the rights of an injured employee who may be ignorant of the procedures or, indeed, the very existence of the workmen's compensation law. Since the employer is generally in a better position to be aware of the employee's rights, it is proper that he should be charged with the responsibility of notifying the employee, under circumstances such as those existing here, that there is a possibility he may have a claim for workmen's compensation benefits." (*Id*. at p. 729.) Because the employer failed to give obligatory notices, "it [could] not raise the technical defense of the statute of limitations to defeat [the employee's] claim." (*Id*. at p. 730.)

Evidence Code section 623 provides in this respect: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." Evidence Code section 623 is a codification of one aspect of equitable estoppel. (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384.) However, an estoppel may arise from a defendant's conduct even if there is no ""designed fraud"" in the defendant's conduct. (*Ibid.*) ""To create an equitable estoppel, 'it is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his

30

position and saved himself from loss.' . . . '. . . Where the delay in commencing action is induced by the conduct of the defendant it cannot be availed of by him as a defense.'"" [Citations.]" (*Ibid*.)

The aforementioned authorities support the conclusion appellant's unlawful policy precluded appellant from relying on the statute of limitations as a defense. (Evid. Code, § 623; *Reynolds*, *supra*, 12 Cal.3d at p. 729.) Since 1991, appellant has enforced a use it or lose policy against its employees in violation of section 227.3.

However, appellant claims respondent cannot rely on *Reynolds* because it involves "equitable estoppel" principles, rather than "tolling" principles, which was the basis of the trial court's decision. Our Supreme Court explained the distinction between equitable tolling and equitable estoppel in *Lantzy v. Centex Homes*, *supra*, 31 Cal.4th at page 383. """"Tolling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended. . . . Equitable estoppel, however, . . . comes into play only after the limitations period has run and addresses . . . the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period. [Equitable estoppel] is wholly independent of the limitations period itself and takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice.'" [Citations.] Thus, equitable estoppel is available even where the limitations statute at issue expressly precludes equitable tolling. [Citations.]" (*Id*. at pp. 383–384.)

"The equitable tolling of statutes of limitations is a judicially created, nonstatutory doctrine. [Citations.] It is 'designed to prevent unjust and technical forfeitures of the right to a trial on the merits when the purpose of the statute of limitations—timely notice to the defendant of the plaintiff's claims—has been satisfied.' [Citation.] Where applicable, the doctrine will 'suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness.' [Citation.] [¶] Though the doctrine operates independently of the language of the Code of Civil Procedure and other codified

sources of statutes of limitations [citations], its legitimacy is unquestioned. We have described it as a creature of the judiciary's inherent power "'to formulate rules of procedure where justice demands it.'" [Citations.]" (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 99–100.)

The equitable tolling doctrine broadly applies when an injured party reasonably and in good faith pursues one of several legal remedies. (*McDonald v. Antelope Valley Community College Dist.*, *supra*, 45 Cal.4th at p. 99; *Elkins v. Derby* (1974) 12 Cal.3d 410, 414.) "Thus, it may apply where one action stands to lessen the harm that is the subject of a potential second action; where administrative remedies must be exhausted before a second action can proceed; or where a first action, embarked upon in good faith, is found to be defective for some reason." (*McDonald v. Antelope Valley Community College Dist.*, *supra*, at p. 100.)

We are not persuaded that the trial court's refusal to allow the statute of limitations as an affirmative defense was error because the trial court referred to "tolling" language in *Sequeira*.

First, although appellant is correct that there is a distinction between equitable tolling and equitable estoppel, it is of no consequence in this case. This is because the discussion in *Sequeira* was not predicated upon equitable tolling principles; but, it was based upon equitable estoppel principles. There was no claim in *Sequeira* that an employee was seeking one of several remedies so that equitable tolling applied. (*Addison v. State of California* (1978) 21 Cal.3d 313, 317.) Rather, the discussion concerned whether an employer's forfeiture policy could bar a statute of limitations defense. As such, the issue is not one of tolling but of an estoppel, which are two distinct doctrines.[5]

---

[5]    The use of "equitable tolling" language in *Sequeira* is more in line with the federal principles. (See, e.g., *Sagehorn v. Engle* (2006) 141 Cal.App.4th 452, 460–461 [discussing equitable tolling in regard to a federal Securities Act of 1933 claim, which requires proof of: "'fraudulent conduct by the defendant resulting in concealment of the operative facts, failure of the plaintiff to discover the operative facts that are the basis of its cause of action within the limitations period, and due diligence by the plaintiff'"].)

32

Second, the fact that the trial court relied on "equitable tolling" language in *Sequeira* does not require a different result. We review a trial court's ruling as opposed to its reasons for the decision. (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1049.) The ruling in this case was that appellant's conduct barred it from asserting the statute of limitations as a defense. The trial court concluded appellant's vacation policy violated section 227.3 by requiring its employees to use it or lose vacation days. The undisputed evidence showed that since 1991 appellant advised its employees that they could not carry over vacation days. Appellant repeatedly misrepresented (or concealed from) its employees that they had a statutory right to be paid unused vacation on termination. The misrepresentations were repeatedly made to class members through appellant's written policies over the course of years. Appellant's human resources employee testified that terminated employees were only paid for the vacation time accrued during the last year. Furthermore, appellant never disclosed that the employees could carry over the vacation time. Appellant also did not disclose that it had a statutory obligation under section 227.3 to pay any unused vacation time on termination. Indeed, the evidence shows that when the illegal policy was brought to appellant's attention through class member Washington's administrative remedy in 2003, appellant did nothing to correct its policy. Rather, it continued to advise its employees they were required to use all their vacation time. By concealing its unlawful conduct from its employees, appellant precluded class members from bringing the action within the statutory period. *Reynolds* supports the trial court's conclusion that the statute of limitations was not available to appellant as a defense notwithstanding a reference to "tolling" language. (Evid. Code, § 623.)

Third, appellant cannot prevail on its claim the estoppel principles were asserted for the first time on appeal. It is true that, because estoppel is an affirmative defense, it must be pled and proved as a bar to a statute of limitations defense. (See *Ard v. County of Contra Costa* (2001) 93 Cal.App.4th 339, 347–348; *Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1785.) But, the record shows that the issue of whether the appellant's conduct precluded the affirmative defense was litigated. When respondent sought to file the first amended complaint, appellant asserted the statute of limitations

33

barred claims dating back to 1991. The trial court granted leave to amend on the ground that appellant's conduct precluded use of the statute of limitations under standards articulated in *Sequeira* (i.e., an employer's forfeiture policy would bar a statute of limitations defense). In addition, the first amended complaint alleged facts sufficient to support the estoppel theory. The first amended complaint alleged appellant had since 1991 and continued to have a policy which denied employees wages. Paragraph No. 14 alleges that appellant "falsely and wrongfully represented to its employees that accrued vacation and accrued personal choice days are not earned wages." Thus, the issue of whether appellant's conduct barred use of the statute of limitations as a defense to this class action was litigated.

### C. *Collateral estoppel and res judicata principles do not bar two class members.*

Appellant claims that class members Washington and Martin should be excluded under collateral estoppel and res judicata principles because they recovered damages for portions of unused vacation in administrative proceedings.

Res judicata bars a subsequent action when the party asserting it proves identical claims; a final judgment; and the party against whom the doctrine is asserted was a party or in privity with a party in the prior adjudication. (*Levy v. Cohen* (1977) 19 Cal.3d 165, 171; *Nathanson v. Hecker* (2002) 99 Cal.App.4th 1158, 1162.) "'The doctrine of res judicata precludes parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction.' [Citation.]" (*Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 620.) A matter will be deemed decided by a prior judgment if it was raised or conclusively determined. (*Sutphin* v. *Speik* (1940) 15 Cal.2d 195, 202.) "But the rule goes further. If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged." (*Ibid.*; *In re Marriage of Mason* (1996) 46 Cal.App.4th 1025, 1028.)

"The application of the doctrine [of res judicata] . . . depends upon an affirmative answer to these questions: '(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom the plea is asserted a party to or in privity with a party to the prior adjudication?'" (*Levy v. Cohen, supra,* 19 Cal.3d at p. 171; *Nathanson v. Hecker, supra,* 99 Cal.App.4th at p. 1162.)

Collateral estoppel is the issue preclusion aspect of res judicata. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828; *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. 3.) The collateral estoppel aspect of the res judicata "may also preclude a party to prior litigation from redisputing *issues* therein decided against him, even when those issues bear on different claims raised in a later case." (*Vandenberg v. Superior Court, supra,* at p. 828; *Lucido v. Superior Court, supra,* at p. 341.) "Collateral estoppel (like the narrower 'claim preclusion' aspect of res judicata) is intended to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation. [Citation.] However, even where the minimal prerequisites for invocation of the doctrine are present, collateral estoppel '"is not an inflexible, universally applicable principle; policy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors."' [Citations.]" (*Vandenberg v. Superior Court, supra,* at p. 829.)

"Collateral estoppel may be applied to decisions made by administrative agencies '[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.'" (*People v. Sims* (1982) 32 Cal.3d 468, 479 superseded by statute on a different point as stated in *Gikas v. Zolin* (1993) 6 Cal.4th 841, 851; *Noble v. Draper* (2008) 160 Cal.App.4th 1, 10.) An administrative decision can have conclusive and binding effects on necessarily decided issues in a later civil action so long as the administrative proceeding had the requisite judicial character. (*State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963, 975–976; *McDonald v. Antelope Valley Community College Dist., supra*, 45 Cal.4th at p. 113.)

The application of collateral estoppel and res judicata doctrines are legal questions subject to de novo review. (*Noble v. Draper, supra,* 160 Cal.App.4th at p. 10; *Roos v. Red* (2005) 130 Cal.App.4th 870, 878.) The party asserting the application of res judicata has the burden of proving the requirements. (*Lucido* v. *Superior Court*, *supra,* 51 Cal.3d at p. 341; *Vella* v. *Hudgins* (1977) 20 Cal.3d 251, 257.) A de novo review shows that the trial court did not err in determining that neither res judicata nor collateral estoppel precluded these class members from participating in the judgment.

At issue here is whether the doctrines should be applied against two class members who obtained Labor Commissioner awards: Martin (for the period of January 1, 2001 to December 31, 2004); and Washington (for earned vacation wages for the period of January 1 to May 22, 2006). The class members claim that they could not have litigated the vacation policy issue because prior to March 2007 the Division of Labor Standards Enforcement (DLSE) enforced Interpretive Bulletin No. 87-7 issued on July 29, 1987. Under that policy, regarding the application of the statute of limitations to vacation pay claims under Labor Code section 227.3, employees were precluded from seeking damages for vacation that accrued more than four years before termination.

*Sequeira, supra*, 32 Cal.App.4th at page 635 relied on the 1987 DLSE policy to conclude that the statute began running as the vacation time was earned. *Sequeira* explained: "The bulletin defines and regulates when an employee may make a claim for payment of unused contractual vacation time which comports with equity under Labor Code section 227.3 and with the applicable statutes of limitation. Unless tolled by a contractual or policy provision which forces employees to use or lose earned vacation time, one has four years from the date of termination to bring an action for compensation for vested time not claimed under a written contract of employment. One may claim payment only for unused time accrued during the four-year period preceding termination. (DLSE Interpretive Bulletin No. 87.7.)" (*Id*. at p. 636.) *Sequeira* considered whether an employee could recover for unused vacation time he had accumulated over 12 years of employment. (*Id*. at pp. 633–634.) *Sequeira* concluded the employee was not entitled to recover for all the unused vacation time over a 12-year employment. (*Id*. at p. 637.)

Rather, he was only entitled to recover for unused vacation time within a four-year limitation period from the date of termination. (*Id*. at pp. 634, 636–637.)

*Church v. Jamison, supra*, 143 Cal.App.4th 1568 subsequently disagreed with *Sequeira's* conclusion that the statute of limitations on vacation pay begins to run as it accrues. Instead, *Church* concluded the employer's obligation to pay an employee for unused vacation benefits under section 227.3 is triggered by termination of employment. (*Church v. Jamison, supra*, at p. 1576.) *Church* held a cause of action to enforce the statutory right to be paid for vested vacation accrues on the date employment is terminated. (*Id*. at p. 1577.)

Both parties agree that the DLSE's policy was abandoned in March 2007, which was after both these individual class member claims were decided. Thus, respondent is correct that the claims could not have been pursued in the administrative action prior to 2007 because both administrative law and *Sequeira* limited an employee's right to recover vacation time which had accrued more than four years before termination. Neither collateral estoppel nor res judicata principles bar them from class membership.

## VI. The Use of Gross Wages to Calculate Lost Wages

Appellant claims the trial court erred in basing the calculations on gross pay rather than base rate of pay. We agree.

Respondent claims the trial court did not err based on express language defining wages in section 200. Section 200, subdivision (a) provides that a wage "includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Our Supreme Court has held: "We construe the term 'wages' broadly to 'include not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as a part of his compensation.' [Citation.] 'Courts have recognized that "wages" also include those benefits to which an employee is entitled as a part of his or her compensation, including money, room, board, clothing, vacation pay, and sick pay. [Citations.]' [Citation.] Incentive compensation, such as bonuses and

37

profit-sharing plans, also constitute wages. [Citations.]" (*Schachter v. Citigroup, Inc.*, *supra*, 47 Cal.4th at p. 618.)

However, we agree with appellant that the trial court erred in calculating the rate of vacation pay to include the commission. Section 227.3 specifically states that on an employee's termination "all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served . . . ." Appellant's policy has always stated that vacation pay is calculated at "base rate." Thus, the trial court erred in concluding that the vacation pay should be calculated using the commission when the employer's policy provides otherwise.

This result is consistent with two DLSE opinion letters cited by appellant, which explain the rate of vacation pay is determined by the employer or contract. An agency's interpretation of a statute, while not binding, is entitled to consideration by the courts. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8.)

Opinion Letter 2003.01.21 states that California law allows an employer to "choose to have a vacation policy which promises to pay a sum while the employee is on vacation which bears no relationship to the wage normally paid to the worker." Opinion Letter 2003.01.21 further explains that "the term 'final rate' as used in Section 227.3 refers to the final rate at which vacation benefits would be paid under the applicable contract of employer policy were the employee to take vacation."

Opinion Letter 2003.01.28 provides: "If the contract of employment bases the vacation pay to be received by the employee on a calculation which includes the base salary and the bonuses, the employee would, of course, be entitled to recover unused vacation pay based on the base salary 'at the final rate' and the bonus based on the rate at which the bonus was calculated." Opinion Letter 2003.01.28 further states: "If, on the other hand, the employer policy simply provides that the vacation paid to an employee is base on the base salary then, obviously, the unpaid vacation would be based on the same criteria calculated at the final rate of that base salary."

In sum, the trial court erred in concluding the employer's express policy on vacation pay should be ignored. Section 227.3 expressly states that the rate of vacation pay due on termination is set by employer policy or contract.

## VII. Vacation Time From IBM

Appellant claims the trial court improperly included forfeited vacation time which had accrued while employed by IBM. The evidence showed appellant began operating as a "spinoff" of IBM in 1991. When it began operating, appellant hired class members, who were formerly employed by IBM. As part of their new employment terms, class members were permitted to carry over vacation, which had been accrued while they were employed with IBM. Appellant subsequently revised the agreement allowing the carry over. However, the trial court determined that the revised terms were based on a "use it or lose it" policy, which violated section 227.3. The trial court's conclusion that the hours should be included in the damages calculations must be upheld because it was supported by the evidence. (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 531–532.)

## VIII. Rejection of Appellant's Expert's Calculations

Appellant claims its expert's calculations were "improperly rejected" by the trial court. We review a trial court's rejection or acceptance of an expert's opinion for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196–197; *Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at pp. 748–749.) An abuse of discretion is established when the ruling exceeds the bounds of reason. (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 18; *North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 285.)

Notwithstanding appellant's attempt to characterize the issue as a legal challenge, the issue is really an evidentiary one. In addition, appellant points to a number of purported deficiencies in the trial court's findings and "criticisms" of its expert. The parties presented competing and conflicting expert testimony on methodologies to prove class damages. It was in the trial court's province to weigh and resolve conflicts and choose the appropriate methodology that would best compensate the class members. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 204; *Bell v. Farmers Ins.*

*Exchange*, *supra*, 115 Cal.App.4th at pp. 748–749.) Appellate courts do not reweigh evidence or reassess the credibility of witnesses. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.) Appellant has failed to establish an abuse of discretion under the circumstances of this case.

## IX. Attorney Fees and Costs

Appellant contends the attorney fee award: was made on an untimely motion; was excessive based on the multiplier; and otherwise was an abuse of discretion. Appellant further contends the trial court abused its discretion in awarding nonrecoverable costs.

### A. *The attorney fees motion was timely.*

According to appellant, the attorney fees motion was untimely. The time limits for filing an attorney fees motion do not run until entry of a judgment at the conclusion of the litigation. (*Carpenter v. Jack In The Box Corp.* (2007) 151 Cal.App.4th 454, 462–468; see also *Crespin v. Shewry* (2004) 125 Cal.App.4th 259, 270–271.)

The trial court originally entered judgment on September 20, 2010. On October 18, 2010, appellant filed a new trial motion. On November 17, 2010, the trial court granted appellant's new trial motion in part; vacated the damages award and reopened the case for a new trial on the portion of damages related to current employees. On March 7, 2011, after additional briefing and expert declarations, the trial court issued an order ruling on damages calculations in response to appellant's new trial motion. On April 21, 2011, the trial court entered an order stating: "The Judgment signed and filed by this Court on [September 9, 2010] is amended as to the amount of the damage award only. The original judgment, as amended, stands."

Respondent filed an attorney fees motion on June 20, 2011, which was set for hearing on July 29, 2011. Appellant claims the attorney fee award was untimely.

California Rules of Court, rule 3.1702(b) provides: "A notice of motion to claim attorney's fees for services up to and including the rendition of judgment in the trial court—including attorney's fees on an appeal before the rendition of judgment in the trial court—must be served and filed within the time for filing a notice of appeal under rules 8.104 and 8.108 in an unlimited civil case or under rules 8.822 and 8.823 in a

40

limited civil case." Because the new trial motion was granted in part, the September 2010 judgment was effectively vacated, the amended judgment became the final judgment of the court. (*Neff v. Ernst* (1957) 48 Cal.2d 628, 634–635; *Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1267–1268.) This rule applies even in the case of a partial new trial because to hold otherwise would violate the one final judgment rule. (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 329.) Here, an amended judgment was filed on April 21, 2011 after the trial court granted a partial new trial. The attorney fees motion was filed within 60 days after entry of the amended judgment. The attorney fees motion was timely. (Cal. Rules of Court, rules 3.1702(b), 8.104, 8.108; *Sanchez v. Strickland* (2011) 200 Cal.App.4th 758, 765.)

### B.     *The attorney fees were reasonable.*

Appellant claims the attorney fees awarded were excessive and unreasonable under a lodestar approach. The method requires the trial court to first determine a touchstone or lodestar, which is the number of hours reasonably, expended multiplied by a reasonable hourly compensation for each attorney. (*Ketchum* v. *Moses* (2001) 24 Cal.4th 1122, 1134; *PLCM Group, Inc.* v. *Drexler* (2000) 22 Cal.4th 1084, 1095; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48.) The trial court may then adjust the lodestar figure upward or downward by taking various "relevant factors" into account. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 985; *Ketchum v. Moses*, *supra*, at p. 1132; *Serrano v. Priest*, *supra*, at p. 48.)

The Supreme Court has also noted: "The 'lodestar adjustment method of calculating attorney fees set forth in *Serrano* III [*Serrano* v. *Priest* (1977) 20 Cal.3d 25] is designed expressly for the purposes of maintaining objectivity.' [Citation.] The trial judge ultimately has discretion to determine the value of the attorney services. 'However, since determination of the lodestar figure is so "[f]undamental" to calculating the amount of the award, the exercise of that discretion must be based on the lodestar adjustment method.' [Citation.]" (*Maria P.* v. *Riles* (1987) 43 Cal.3d 1281, 1295 quoting *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322.)

41

In this case, the trial court found that a multiplier of 2.0 was warranted. Appellant claims no enhancement was warranted. Our Supreme Court has identified the relevant factors in the determination as follows: "Among these factors were: (1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed; and (7) the fact that in the court's view the two law firms involved had approximately an equal share in the success of the litigation." (*Serrano v. Priest*, *supra*, 20 Cal.3d at p. 49, fn. omitted.)

In applying these factors, the trial court's analysis is anchored to an objective determination of the value of the services so that the amount awarded is not arbitrary. (*Ketchum* v. *Moses*, *supra*, 24 Cal.4th at p. 1134; *PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1095.) Ultimately, though "'[t]he experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*PLCM Group, Inc. v. Drexler*, *supra*, at p. 1095.)

The trial court found that use of enhancement multiplier of 2.0 was warranted "due to the length of the case (over 5 years), the complexities of the matter (often the result of the contentiousness of the litigation), the results obtained for the client (over $7 million in damages as well as an injunction against the Defendant), the thousands of hours spent on the case which precluded other employment by the attorneys, and the substantial risk to the attorneys involved due to the contingent nature of the fee award."

Appellant attacks the trial court's determination that a multiplier was warranted as a "windfall" under standards articulated in *Flannery v. California Highway Patrol* (1998)

42

61 Cal.App.4th 629 and *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128. Appellant asserts: respondent's counsel "touted themselves as top-notch attorneys commanding top rates" so the questions were not novel or difficult for them; the attorneys were not meaningfully or substantially kept from other legal work; the risk involved did not justify an upward adjustment; and the result obtained "was not as great as it seems at first blush." None of these arguments are persuasive. We have examined the entire voluminous record in the case including: the complexity of issues; the contentious nature of the pretrial, trial, and posttrial proceedings; and the amount of briefing and rebriefing of issues which occurred during the proceedings. In addition, five writs were taken in this case. Appellant also tried to remove the case to federal court. Respondent's counsel worked on the case for over five years and spent 5,200 hours and $300,000 litigating the case. We are convinced that the trial court did nothing wrong in determining the value of services rendered by respondent's counsel. (*Maria P. v. Riles*, *supra*, 43 Cal.3d at p. 1295.)

Appellant also claims the trial court included appellate work in the award. But, the record shows that respondent conceded that $14,932.50 spent on the appeal should be excluded. So the amount was not included in the attorney fee award.

Appellant contends respondent obtained attorney fees for his unsuccessful commission claims. Respondent's counsel declared that hours spent solely litigating the individual claims including the trial dates were excised from the attorney fees request. The trial court found respondent's 200-hour discount plus a 5 percent reduction "was adequate for the three days of time dealing [with] at least a portion of [respondent's] individual claim" was sufficient. We cannot reweigh or discount the trial court resolution of this factual matter.

Similarly, appellant cannot prevail on additional challenges to other factual resolutions by the trial court and the exercise of its discretion to reject appellant's objections to particular tasks. "Where a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised." (See

43

*Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 997.) The trial court rejected appellant's contentions regarding time spent for work on motions in limine and other jury related work. Rather, the trial court found that, notwithstanding the jury waiver, some of the in limine motions were granted and were useful at trial as to admission of evidence. Appellant has failed to establish the trial court abused its discretion in rejecting appellant's objections to any fees related to the in limine motions. Appellant has also not established the trial court abused its discretion in allowing attorney fees for unsuccessful motions and relief from a late expert designation.

Appellant also claims the trial court should have excluded time for the unfair competition claims under the Business and Professions Code. But, the trial court did not abuse its discretion because the unfair competition claims in this case were "interrelated." (See *Pellegrino v. Robert Half Internat., Inc.* (2010) 182 Cal.App.4th 278, 288–289; see also *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129–130.) Proof of the unfair competition claim required proof of the vacation policy embodied in section 227.3. The trial court's exercise of its discretion under the circumstances did not exceed the bounds of reason under all the circumstances. (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1604.)

Finally, there is no basis to set aside the $146,783.50 award for the attorney fees motion. The fee was based on 129.15 hours for fee-related work. Appellant has not demonstrated that the attorney fees were unreasonable as a matter of law because they were sought for "a single motion." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639.) The record in this case establishes the contrary.

### C. *The cost award was within the trial court's discretion.*

Appellant claims the trial court abused its discretion in awarding unnecessary and unrecoverable costs. The right to recover costs is purely statutory. (*Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436, 439; *Boonyarit v. Payless Shoesource, Inc.* (2006) 145 Cal.App.4th 1188, 1192.) Code of Civil Procedure section 1032, subdivision (b) provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." As a general

rule, the costs of a civil action include the expenses of litigation, excluding attorney fees. (*Davis v. KGO-T.V., Inc.*, *supra*, at p. 439.) Code of Civil Procedure section 1033.5, subdivisions (a) and (b), set forth allowable or not allowable items as costs, respectively. Code of Civil Procedure section 1033.5, subdivision (c)(4), however, allows the trial court at its discretion to allow or deny any costs not specifically mentioned in the section.

Appellant contends the trial court should have taxed costs for: expert witness fees in the amount of $65,030; unnecessary high tech equipment in the amount of $18,393.87; miscellaneous expenses; and $8,752.56 in computerized research.

Appellant also claims the trial court abused its discretion in failing to strike $65,030 in costs for the expert fees. Code of Civil Procedure section 1033.5, subdivision (b)(1) does not allow as costs "[f]ees of experts not ordered by the court." In the absence of a court order appointing the expert, the fees are not recoverable. (*Davis v. KGO-T.V., Inc.*, *supra*, 17 Cal.4th at pp. 439–442; *Sanchez v. Bay Shores Medical Group* (1999) 75 Cal.App.4th 946, 950.) The record shows that, in awarding the costs, the trial court found that it had ordered the parties to submit additional expert testimony to assist the trial court in the partial new trial on damages. The trial court found: "[I]t would have been exceedingly difficult to comply with the court's order otherwise. The complexities of the damage calculations in this case have required expert involvement not only to establish the formulas behind the calculations but also to apply those formulas on the addition of new facts." The appointment was in accordance with Evidence Code section 730, so the fees are recoverable. (*Sanchez v. Bay Shores Medical Group*, *supra*, at p. 950.)

Appellant has not cited any authority which shows that the costs for the so-called "high tech" equipment in the amount of $18,393.87 were not recoverable. Contrary to appellant's contentions, *Science Applications Internat. Corp. v. Superior Court* (1995) 39 Cal.App.4th 1095 does not establish that the trial court abused its discretion in allowing costs for a PowerPoint presentation computerized, equipment rental, technician, to present exhibits to the trial court on a monitor. *Science Applications* was not followed by the court in *El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc.* (2007) 150

45

Cal.App.4th 612. El *Dorado* concluded that, even assuming the costs are not allowable for models and blowups (Code Civ. Proc., § 1033.5, subd. (a)(12)), the recovery of the costs including labor to support the displays is discretionary with the court. (*El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc., supra*, at pp. 617–618.) Because the costs are discretionary, appellant was required to establish the costs were unreasonably high such that the trial court abused its discretion in allowing them.

Similarly, appellant failed to establish the trial court abused its discretion in awarding costs in the following amounts for: unspecified travel costs ($15,572.71); messenger service fees ($5,213.85); and routine expenses such as parking ($1,170.13), hotel and rental car expense ($295.48); and weekend air conditioning ($280).

Appellant also challenges an item of cost for $8,204.07 for computerized legal research which it concedes the trial court denied. Appellant claims the trial court then improperly award the item in the attorney fee award. We agree with respondent that the costs were recoverable as attorney fees. (See *Plumbers & Steamfitters, Local 290 v. Duncan* (2007) 157 Cal.App.4th 1083, 1099.)

# DISPOSITION

The amended judgment is reversed insofar as it awards damages calculated at the gross rate of pay rather than at the base rate. The matter is remanded for the trial court to recalculate damages in accordance with the views expressed in this opinion. In all other respects, the amended judgment is affirmed. Respondent, Ron Molina, is awarded his costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

47